JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRANDON MUHAMMAD,<br><br>　　　　　　Plaintiff,<br><br>　　　v.<br><br>CHINA SKY ONE MEDICAL, INC., et al.,<br><br>　　　　　　Defendants. | Case No. CV 12-2552 DMG (CWx)<br><br>**ORDER RE PLAINTIFF'S MOTION FOR ENTRY OF DEFAULT JUDGMENT AND MOTION FOR CLASS CERTIFICATION [Doc. # 46]** |

This matter is before the Court on Plaintiff Brandon Muhammad's[1] motion for default judgment against Defendant China Sky One Medical, Inc. ("China Sky") and motion for class certification. [Doc. # 46.] The July 11, 2014 hearing was vacated because Plaintiff submitted on the Court's tentative ruling. For the reasons set forth below, the motion for default judgment is **DENIED** and the motion for class certification is **DENIED**.

## I.
## PROCEDURAL HISTORY

On March 23, 2012, Muhammad filed a putative class action complaint against Defendants China Sky, Yan-Qing Liu, Xiao-Yan Han, Yu-Bo Hao, Yu-Kun Zhang, and Hong-Yu Pan alleging the following causes of action: (1) violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder; and (2) violation of Section 20(a) of the Exchange Act. [Doc. # 1.]

On March 30, 2012, Muhammad filed proof of service as to China Sky. [Doc. # 5.] On September 17, 2012, the Clerk of the Court entered default against China Sky. [Doc. # 36.]

On April 21, 2014, the Court dismissed without prejudice for failure to prosecute Defendants Yan-Qing Liu, Xiao-Yan Han, Yu-Bo Hao, Yu-Kun Zhang, and Hong-Yu Pan. [Doc. # 44.] The Court instructed Muhammad to file an application for entry of

---

[1] While the Court granted an unopposed motion to appoint Hugues Depauw as lead plaintiff in this action on May 22, 2012 [Doc. # 32], the operative Complaint contains *no allegations* as to Depauw. Nor do any of the documents filed in conjunction with the motions establish when, if ever, Depauw purchased the securities at issue in this action. Thus, there is nothing in the record to suggest that *Depauw* has suffered an injury in fact, and Depauw therefore lacks Article III standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)).

The motion for default judgment and motion for class certification appears to be brought by "Lead Plaintiff and proposed class representative Hugues Depauw." [*See* Doc. # 46.] Nonetheless, the Court assumes that Depauw's counsel, Pomerantz LLP, which also represents Muhammad, also intended to file the motions on behalf of Muhammad.

1  default judgment as to China Sky pursuant to Federal Rule of Civil Procedure 55(b) by
2  no later than May 21, 2014. (*Id.*)

3  On May 21, 2014, Muhammad filed a motion for default judgment against China
4  Sky and motion for class certification. [Doc. # 46.] To date, China Sky has neither
5  appeared in this action nor opposed the pending motions.

## II.

## FACTS ALLEGED IN THE COMPLAINT[2]

China Sky manufactures pharmaceutical and medicinal products and diagnostic kits. (Compl. ¶¶ 2, 20.) China Sky reported the following financial results regarding its quarterly revenue, income, and diluted earnings per share ("EPS") in press releases and Form 10-Q reports filed with the Securities and Exchange Commission ("SEC"):

| Date Reported | Quarter | Disclosure Type | Revenue Reported | Net Income Reported | EPS Reported |
|---|---|---|---|---|---|
| Unspecified Date | Fourth 2007 | Unspecified Source | $12.7 million | $4.1 million | $0.25 |
| Unspecified Date | First 2008 | Unspecified Source | $12.4 million | $8 million | $0.50 |
| Unspecified Date | Second 2008 | Unspecified Source | $24 million | $8 million | $0.50 |
| Unspecified Date | Third 2008 | Unspecified Source | $30 million | $10 million | $0.60 |
| April 15, 2009 | Fourth 2008 | Press Release | $26 million | $6.9 million | $0.45 |
| May 14, 2009 | First 2009 | Press Release | $25 million | $7 million | $0.43 |
| August 14, 2009 | Second 2009 | Press Release | $32 million | $8 million | $0.51 |
| August 14, 2009 | Second 2009 | Form 10-Q | $32 million | $8 million | $0.51 |
| November 17, 2009 | Third 2009 | Press Release | $43 million | $12.6 million | $0.75 |
| March 17, 2010 | Fourth 2009 | Press Release | $30 million | $5.3 million | $0.32 |
| May 18, 2010 | First 2010 | Press Release | $28.9 million | $12.6 million | $0.74 |
| August 10, 2010 | Second 2010 | Press Release | $41 million | $12 million | $0.73 |
| November 8, 2010 | Third 2010 | Press Release | $36 million | $8.6 million | $0.51 |
| November 8, 2010 | Third 2010 | Form 10-Q | $36 million | $8.6 million | $0.51 |
| March 15, 2011 | Fourth 2010 | Press Release | $27 million | $2.5 million | $0.15 |
| May 10, 2011 | First 2011 | Press Release | $28 million | $6 million | $0.36 |

---

[2] The Court accepts as true the factual allegations of the Complaint, except those relating to the amount of damages, solely for purposes of deciding the motion for default judgment. *See Garamendi v. Henin*, 683 F.3d 1069, 1080 (9th Cir. 2012).

| | | | | | |
|---|---|---|---|---|---|
| May 10, 2011 | First 2011 | Press Release | $28 million | $6 million | $0.36 |
| August 9, 2011 | Second 2011 | Press Release | $38 million | $6 million | $0.36 |
| August 9, 2011 | Second 2011 | Form 10-Q | $38 million | $6 million | $0.36 |
| November 9, 2011 | Third 2011 | Press Release | $26.6 million | $531,000 | $0.03 |
| November 9, 2011 | Third 2011 | Form 10-Q | $26.6 million | $531,000 | $0.03 |

(*Id.* ¶¶ 21-22, 24-26, 28, 30, 32, 34, 37-38, 40-42.)

China Sky also reported the following financial results regarding the company's annual revenue, income, and EPS in press releases and Form 10-K reports filed with the SEC:

| Date Reported | Year | Disclosure Type | Revenue Reported | Net Income Reported | EPS Reported |
|---|---|---|---|---|---|
| Unspecified Date | 2007 | Unspecified Source | $49 million | $15.3 million | $1.15 |
| April 15, 2009 | 2008 | Press Release | $91.8 million | $29 million | $1.87 |
| April 15, 2009 | 2008 | Form 10-K | $91.8 million | $29 million | $1.87 |
| March 17, 2010 | 2009 | Press Release | $130.1 million | $35 million | $2.07 |
| March 15, 2011 | 2010 | Press Release | $133 million | $36 million | $2.14 |

(*Id.* ¶¶ 21-22, 30, 39-40.)

On September 3, 2010, China Sky issued a press release announcing that Yu-Bo Hao, its Chief Financial Officer, was resigning "due to health considerations."[3] (*Id.* ¶¶ 16, 35.) The press release also revised China Sky's financial guidance for 2010 and providing the following explanation:

> Management's reduced guidance reflects the termination of relationships with certain private distributors, who after several rounds of discussions, chose to end their cooperation with the Company after learning that their business information was disclosed in the Company's public SEC filings and would continue to be disclosed in such documents as required by SEC regulations. This disclosure, these distributors claim has led to increased scrutiny of their financial performance by government authorities within China. While the Company expects to replace these lost distribution

---

[3] Subsequently, between November 2010 and September 2011, Hao served as China Sky's Secretary, Vice President, and a Director on the Board. (*Id.* ¶ 16.)

-4-

arrangements over time, revenue and net income in the second half of 2010 are expected to be negatively impacted by the disruption in distribution channels. The Company expects to incur higher selling and marketing costs during second half 2010 to develop new distributor relationships.

(*Id.* ¶ 35.) China Sky's shares declined $3.02 per share to close at $6.67 per share on September 7, 2010. (*Id.* ¶ 36.)

On May 19, 2011, *China Economic Review* published an article that warned investors to "continue to be cautious" about China Sky's stock for the following reasons: (1) the company's gross margins are "suspiciously high" compared to other "China-listed TCM companies" despite the fact that China Sky spends less on advertising and its main products are not unique; (2) the company's figure for inventory turn-around is "suspect" and "far below the average of supermarket and convenience stores chains"; and (3) "[c]ustom research by China Economic Review also casts doubt onto China Sky One's claim that its distribution network covers all of China's major metropolitan areas and, consequently, its impressive annual revenue figures." (*Id.* ¶ 43.) China Sky's shares declined by $0.15 per share to close at $2.86 per share on May 19, 2011.

On September 9, 2011, China Sky disclosed that Hao—who had alternately served as the company's Secretary, Vice President and a Director on the Board since November 2010—was resigning. (*Id.* ¶¶ 16, 48.) The company also disclosed that Xiao-Yan Han, China Sky's Vice Chairman and a Director on the Board, was resigning. (*Id.* ¶¶ 15, 48.) China Sky's shares declined $0.25 per share to close at $2.28 per share on September 12, 2011. (*Id.* ¶ 49.)

On December 19, 2011, China Sky disclosed that Yan-Qing Liu, its Chief Executive Officer ("CEO"), President, and Chairman of the Board of Directors, "was sent to the hospital due to a massive hemorrhage of his intestinal tract that occurred on December 17, 2011." (*Id.* ¶¶ 14, 52.)

On February 15, 2012, China Sky disclosed that Liu was "being treated for a life-threatening illness." (*Id.* ¶ 53.) The company also disclosed that 26 "middle-

management level employees" had resigned. (*Id.*)  Nine of the employees were in the accounting department and two of the employees were in the internal controls department. (*Id.*)  On that same day, NASDAQ announced a trading halt in China Sky's shares until it received required "additional information" from the company. (*Id.* ¶ 54.)  China Sky's shares dropped $0.43 per share to close at approximately $1.54 per share before the trading halt. (*Id.* ¶ 55.)

Muhammad alleges that China Sky's statements in press releases from April 15, 2009 to May 10, 2011 about its quarterly and annual revenue, net income, and EPS were "materially false and/or misleading because they represented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them that (1) the company was inflating reported earnings; (2) the company's gross margins were inflated; (3) the company lacked adequate internal and financial controls; and (4) as a result of the foregoing, the company's statements were materially false and misleading at all relevant times." (*Id.* ¶ 47.)  Muhammad also apparently alleges[4] that China Sky's statements in Forms 10-K and Forms 10-Q filed with the SEC were materially false and/or misleading for the same reasons. (*See id.*)

Muhammad purchased China Sky securities at an unspecified time during the Class Period—between April 16, 2009 and February 14, 2012, inclusive. (Compl. ¶¶ 1, 12.)

Muhammad alleges that "Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon [Muhammad] and the other members of the Class; made various untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

---

[4] While Muhammad alleges that the statements in the forms filed with the SEC were materially false and/or misleading in one paragraph of his Complaint (*see id.* ¶ 47), he also alleges that the reports to the SEC "*represented* the Company's . . . financial results and financial position." (*See id.* ¶¶ 23, 27, 29, 31, 33, 39 (emphasis added).)

employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities." (*Id.* ¶ 68.) Muhammad also alleges that Defendants were "personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of China Sky securities from their personal portfolios." (*Id.* ¶ 72.)

## III.
## LEGAL STANDARD

Federal Rule of Civil Procedure 55(b)(2) provides that a court may enter default judgment and, if necessary to effectuate judgment, the court may conduct an accounting, determine the amount of damages, establish the truth of any allegation by evidence, or investigate any other matter. Default judgments are usually disfavored. *Eitel v. McCool*, 782 F.2d 1470, 1472 (9th Cir. 1986).

In *Eitel*, the Ninth Circuit set forth a number of factors that courts may consider when evaluating a default judgment application: (1) the possibility of prejudice to the plaintiff; (2) the merits of the plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Id*. at 1472-73 (citing 6 *Moore's Federal Practice* ¶ 55-05[2]).

## IV.
## DISCUSSION

### A.   Compliance with Local Rule 55-1

Muhammad served the summons and complaint on China Sky on March 28, 2012. [Doc. # 5.] Muhammad does not appear to have served China Sky with notice of this motion, but China Sky has not appeared in the action so Muhammad is not required to notify it. *See* L.R. 55-1(e); Fed. R. Civ. Pro. 55(b)(2).

Muhammad has not satisfied, however, all the procedural requirements for default judgment. The notice of motion [Doc. # 46] and Declaration of Murielle J. Steven Walsh

[Doc. # 48] do not meet the additional requirements of Local Rule 55-1. *See generally PepsiCo, Inc. v. Cal. Sec. Cans,* 238 F. Supp. 2d 1172, 1175 (C.D. Cal. 2002) (the procedural requirements of Rule 55 and Local Rule 55-1 were met where plaintiffs addressed each required factor in their application for default judgment). While this deficiency alone is sufficient to deny Muhammad's motion for default judgment, the Court also finds that the motion must dismissed upon review of the *Eitel* factors, as discussed *infra*.

### B. *Eitel* Factors

#### 1. Possibility of Prejudice to Muhammad

In light of the fact that China Sky defaulted, thereby admitting the averments of the TAC, Muhammad will be harmed if his motion is not granted. Failure to enter a default judgment will prejudice Muhammad by denying him the right to judicial resolution of his claims against China Sky without any other recourse for recovery. *See, e.g., Elektra Entm't Grp, Inc. v. Crawford*, 226 F.R.D. 388, 392 (C.D. Cal. 2005).

Accordingly, this factor weighs in favor of entering default judgment against China Sky.

#### 2. Merits of Muhammad's Substantive Claims and Sufficiency of the Complaint

The second and third *Eitel* factors are (1) the merits of Muhammad's substantive claims, and (2) the sufficiency of the Complaint. 782 F.2d at 1471-72. "The Ninth Circuit has suggested that these two factors require that a plaintiff state a claim on which the plaintiff may recover." *PepsiCo*, 238 F. Supp. 2d at 1175.

Muhammad's Complaint is woefully inadequate to state claims for violations of Section 10(b) and Section 20(a).

"Section 10(b) of the Securities Exchange Act of 1934 provides that it is unlawful to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance . . . . Pursuant to this section, the Securities and

Exchange Commission promulgated Rule 10b–5, which makes it unlawful, among other things, to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Reese v. Malone*, 747 F.3d 557, 567 (9th Cir. 2014) (internal quotations and brackets omitted) (alterations in original).

To prevail on a claim for fraudulent misrepresentation under Section 10(b), a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157, 128 S. Ct. 761, 169 L. Ed. 2d 627 (2008).

"At the pleading stage, a complaint stating claims under Section 10(b) and Rule 10b–5 must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA")." *Reese*, 747 F.3d at 568 (citation omitted). "Under Rule 9(b), claims alleging fraud are subject to a heightened pleading requirement, which requires that a party 'state with particularity the circumstances constituting fraud or mistake.'" *Id.* (quoting Fed. R. Civ. P. 9(b)). "[S]ince 1995, all private securities fraud complaints are subject to the more exacting pleading requirements of the PSLRA, which require that the complaint plead with particularity both falsity and scienter." *Id.* (internal quotation omitted).

### a. Falsity

"To plead falsity, the complaint must specify each statement alleged to have been misleading, and the reason or reasons why the statement is misleading. If an allegation regarding the statement or omission is made on information and belief, the complaint must state with particularity all facts on which that belief is formed." *Id.*

While Muhammad conclusorily alleges that *all* statements by China Sky about its annual and quarterly revenue, net income, and EPS in press releases and SEC filings from April 15, 2009 to May 10, 2011 were misleading (*see* Compl. ¶ 47), he fails to provide

-9-

*any* detailed factual allegations in support of his assertion. Muhammad's only support for his assertion appears to be that a periodical warned investors to "be cautious" about China Sky stock because its reported gross margins, inventory turn-around, and distribution network were suspicious. (*See id.* ¶ 43.)

The Complaint does not include any factual allegations about China Sky's actual revenue, profit, and EPS numbers so as to identify the extent of any alleged misrepresentations. *See Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1114-16 (C.D. Cal. 2012) (plaintiffs sufficiently alleged falsity when they alleged that there were *significant discrepancies* between revenue numbers the company reported to the SEC and those reported to China's State Administration for Industry and Commerce, the differences could not be rationally explained by different accounting principles, *and* information provided to Chinese regulators was likely accurate due to substantial fines and serious criminal penalties that could result from false information). Nor does the Complaint provide allegations regarding the reported revenue and profits of China Sky's competitors in an effort to establish that China Sky's reported numbers could not possibly be correct. *See Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 938 (C.D. Cal. 2012).

Muhammad also conclusorily asserts that China Sky lacked adequate internal and financial controls, but the Complaint lacks *any* factual allegations about China Sky's internal and financial controls such that the Court can discern what was "lacking."

### b. Scienter

"To adequately plead scienter, the complaint must 'state with particularity facts giving rise to *a strong inference* that the defendant acted with the required state of mind.'" *Reese*, 747 F.3d at 568 (quoting 15 U.S.C. § 78u–4(b)(2)(A)) (emphasis in original). "A strong inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 569 (internal quotation omitted). "The inference must be that the defendant made false or misleading statements either *intentionally* or with *deliberate recklessness.*" *Id.* (internal quotation and brackets omitted) (emphasis in

original). "Deliberate recklessness means that the reckless conduct reflects some degree of intentional or conscious misconduct." *Id.* (internal quotation omitted). "An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Id.* (internal quotation and brackets omitted).

In the Ninth Circuit, courts engage in a two-part analysis to determine if scienter has been sufficiently pled. *See id.* at 580. First, "the court determines whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter." *Id.* (citation omitted). Second, "if no individual allegation is sufficient, the court is to conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.* (internal quotation omitted).

The Complaint contains the following allegations that arguably bear on scienter[5]: (1) a periodical warned investors about investing in China Sky on the ground that numbers reported by the company were suspicious; (2) two officers of China Sky resigned; and; (3) on the same day that the CEO's life threatening illness was publicly disclosed, NASDAQ announced a trading halt due to missing "required additional information" and 26 of China Sky's middle management level employees resigned.

With respect to the periodical, even assuming *arguendo* that Muhammad had sufficiently alleged that China Sky's reported revenue, net profit, and EPI numbers were suspicious, the Ninth Circuit has held that as a general rule "bare allegations of falsely reported information" are insufficient to establish scienter. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009). The Ninth Circuit has recognized

---

[5] To the extent Muhammad attempts to rely on boilerplate language in China Sky's 10-K and 10-Q forms to establish scienter, the Ninth Circuit has specifically held that such facts "add nothing substantial to the scienter calculus." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1003-04 (9th Cir. 2009).

-11-

two exceptions to the rule where (1) a plaintiff provides "particular" allegations regarding a management's role in the company that "suggest that the defendant had actual access to the disputed information" and (2) where "the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Id.* (internal quotations omitted). Muhammad has provided *no* factual allegations regarding the management's role in the company, and thus the first exception is clearly inapplicable. As for the second exception, Muhammad's failure to plead facts demonstrating *obvious* falsity is fatal to any effort to fit within this exception. *See generally Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 743-44 (9th Cir. 2008) ("[T]here could be circumstances in which a company's public statements were so important and *so dramatically false* that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publication." (initial emphasis added)).

With respect to the remaining two events Muhammad identified, the nonfraudulent inference is more plausible than the fraudulent inference—that is, China Sky's officers resigned because the company's leadership was in disarray, and China Sky essentially imploded in February 2011 after its CEO was hospitalized with a life-threatening illness and stopped running the company.

Nor does a holistic review of the allegations change the analysis. The Complaint is bereft of factual allegations that China Sky was reporting significantly higher revenues, net profits, and EPI than its similarly situated competitors. Nor does the Complaint include any factual allegations regarding statements and actions by the company's officers suggesting that they were intentionally over-reporting revenues. The Complaint also contains no factual allegations regarding China Sky's operations or accounting that would suggest intentional over-reporting of revenues.

While the company's reported financial figures may be susceptible to a fraudulent inference to *some* extent, a nonfraudulent inference is equally, if not more, plausible for at least three reasons: (1) China Sky timely and publicly revised its financial estimates *downward* based on the termination of its relationships with private distributors,

acknowledging that it expected revenue and net income for the second half of 2010 to be "negatively impacted"; (2) the revenue, net income, and EPS numbers reported do not consistently increase during the period of alleged misrepresentations, but rather show significant increases and decreases; (3) the hospitalization of the company's CEO for a "life-threatening" illness—rather than disclosure of suspicions of wrongdoing—immediately preceded the mass exodus of employees and NASDAQ's trading halt.

### c. Loss Causation

To prove loss causation, or proximate cause, a plaintiff "must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff." *In re Daou Sys., Inc.,* 411 F.3d 1006, 1025 (9th Cir. 2005). A plaintiff need not show that the misrepresentation is the sole reason for the investment's decline in value as long as "the misrepresentation is one substantial cause of the investment's decline in value." *Id.*

Here, the allegations in the Complaint are insufficient to establish loss causation. Muhammad identifies four occasions on which the shares lost value: (1) a $3.02 per share decline to $6.67 per share on September 7, 2010 after China Sky announced that its CFO was resigning for health reasons and it revised its financial guidance downward due the breakdown in relations with certain private distributors; (2) a $0.15 per share decline to $2.86 per share on May 19, 2011 after the *China Economic Review* article suggesting China Sky was a risky investment; (3) a $0.25 per share decline to $2.28 per share on September 12, 2011 after the announcement that two officers were resigning; and (4) a $0.43 per share decline to $1.54 on February 15, 2012 after China Sky disclosed that its CEO was "being treated for a life-threatening illness," 26 middle management employees resigned, and the NASDAQ announced a trading halt in the company's stock. Other than the article—which triggered a relatively modest decline in share value—none of the events directly relate to the alleged misrepresentations at issue—that is, Muhammad's assertion that China Sky had inflated its revenues and net profits and had poor internal financial controls. Indeed, the single greatest decline in share price appears to be

attributable to China Sky's public disclosure of the problems it was having with its distributors and the health issues of one of its officers. Nor has Muhammad provided *any factual allegations* linking the apparently unrelated events to China Sky's alleged misrepresentations.

Moreover, it appears that China Sky's stock lost most of its value after the September 7, 2010 announcements and before the publication of the *China Economic Review* article and 2011-2012 resignations. Nonetheless, the Complaint does not discuss any price declines during this period. The absence of allegations suggests that at best, only some fraction of the stock's decline in value can be attributed to the events identified by Muhammad.

As a claim for a violation of Section 20(a) requires a primary violation of federal securities laws, *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000), Muhammad's second claim necessarily fails if his Section 10(b) claim fails.

For the foregoing reasons, the third *Eitel* strongly weighs against entry of default judgment against China Sky.

### 3. Sum of Money at Stake

The Court must also weigh the amount of money at stake against the seriousness of China Sky's conduct. *Philip Morris USA, Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494, 500 (C.D. Cal. 2003). "This requires that the court assess whether the recovery sought is proportional to the harm caused by defendant's conduct." *Landstar Ranger, Inc. v. Parth Enterprises, Inc.*, 725 F. Supp. 2d 916, 921 (C.D. Cal. 2010). While the allegations in a complaint are taken to be true for the purposes of default judgment, the Court must make specific findings of fact in assessing damages, which are not afforded the same deference as the well-pleaded allegations of a complaint. *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002).

Here, Muhammad seeks entry of default judgment against China Sky for $8,390,703. (Mot. at 1.) For the reasons discussed *supra*, he has not demonstrated that China Sky's conduct amounted to a violation of Section 10(b) or Section 20(a). Thus, the

Court cannot conclude that these purported damages are proportional to China Sky's conduct.

Accordingly, the fourth *Eitel* factor does not favor entry of default judgment against China Sky.

### 4. Possibility of Dispute as to Material Facts

For the reasons discussed, *supra*, the possibility of a dispute as to material facts is significant, given the serious deficiencies in Muhammad's Complaint. While there is no possibility of a dispute concerning the limited *material facts* alleged in the Complaint, *see Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 702 (9th Cir. 2008), the problem in this case is that the Complaint mostly relies on broad, conclusory assertions, rather than allegations of material fact.

This factor thus weighs against entering default judgment.

### 5. Existence of Excusable Neglect

China Sky received notice of this suit on March 28, 2012 when the Complaint and Summons were served. [Doc. # 5.] Over two years have elapsed since then, and China Sky has failed to appear in this action or oppose the motion for default judgment. There is no evidence of excusable neglect, and the Court finds the possibility of excusable neglect remote.

Accordingly, this factor favors entry of default judgment.

### 6. Policy Favoring Decisions on the Merits

"Cases should be decided upon their merits whenever reasonably possible." *Eitel*, 782 F.2d at 1472. China Sky's failure to defend this action makes a decision on the merits impractical if not impossible. *See Elektra Entm't Grp.*, 226 F.R.D. at 392 (noting that under Fed. R. Civ. P. 55(a), termination of a case before hearing the merits is allowed whenever a defendant fails to defend an action). Although this factor weighs against entering default judgment, it would not preclude the Court from doing so absent the deficiencies in the Complaint described above.

**V.**

**CONCLUSION**

In light of the foregoing, on balance, the *Eitel* factors do not favor default judgment. Muhammad's motion for default judgment is thus **DENIED** and his motion for class certification is **DENIED** as moot.

**IT IS SO ORDERED.**

DATED: July 14, 2014

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE